T.C. Memo. 2017-54

UNITED STATES TAX COURT

DANIEL E. LARKIN AND CHRISTINE L. LARKIN, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

DANIEL E. LARKIN AND CHRISTINE LARKIN, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 14886-08, 19940-09.          Filed April 3, 2017.

Daniel E. Larkin, pro se.

Grubert Roger Markley, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

GALE, Judge:  These cases were consolidated for purposes of trial, briefing,
and opinion.  Petitioners petitioned the Court with respect to respondent's statutory
notices of deficiency determining the following deficiencies, additions to tax, and

[*2] penalties with respect to petitioners' Federal income tax for taxable years

2003 through 2006 (subject years):[1]

| Year | Deficiency | Addition to tax sec. 6651(a)(1) | Penalty sec. 6662(a) |
|------|-----------|--------------------------------|---------------------|
| 2003 | $131,507 | $32,877 | $26,301 |
| 2004 | 91,873 | -0- | 18,375 |
| 2005 | 142,870 | 14,287 | 28,574 |
| 2006 | 157,890 | -0- | 31,578 |

The notices of deficiency include adjustments with respect to certain items

that passed through to Mr. Larkin in his capacity as a partner in the law firm of

Squire, Sanders & Dempsey, L.L.P. (SSD). Those items are "partnership items"[2]

within the meaning of section 6231(a)(3).[3] As we lack jurisdiction in this

proceeding to redetermine those partnership items, see sec. 6221; Maxwell v.

Commissioner, 87 T.C. 783, 789 (1986), we treat them as having been reported

---

[1]Respondent issued a notice of deficiency covering 2003 and 2004 that was timely petitioned in docket No. 14886-08 and a notice of deficiency covering 2005 and 2006 that was timely petitioned in docket No. 19940-09.

[2]Petitioners admit that Mr. Larkin was a partner in SSD, and the notices of deficiency treat SSD as a "partnership" within the meaning of sec. 6231(a)(1). Petitioners have not shown that SSD was a "small partnership" within the meaning of sec. 6231(a)(1)(B).

[3]Unless otherwise indicated, all section references are to the Internal Revenue Code (Code) as in effect for the subject years, and all Rule references are to the Tax Court Rules of Practice and Procedure. All dollar amounts have been rounded to the nearest dollar.

[*3] correctly by SSD on the Schedules K-1, Partner's Share of Income, Credits, Deductions, etc., issued to Mr. Larkin for each subject year, see sec. 6222.

The parties have settled some of the adjustments in the notices of deficiency.[4] We are left to decide the following issues:

1. whether section 911 entitles petitioners to exclude from their gross income for the subject years foreign earned income and housing costs of $184,207, $174,632, $177,876, and $140,416, respectively.[5] We hold in accordance with

---

[4]Petitioners concede that they failed to report the following items for 2006: interest of $789 from the Larkin Family Partnership (LFP), a "small partnership" within the meaning of sec. 6231(a)(1)(B); interest of $639 from PNC Bank National Association (PNC); capital gains of $586 from LFP; and dividends of $1,148 from LFP. Respondent concedes that petitioners (through LFP) may credit $180 against their rental income for 2006.

In their opening brief petitioners attempt to place in issue the above-referenced interest for 2006 attributable to LFP and PNC, which they conceded in the parties' stipulations. Justice does not require that we disregard the stipulations underlying that concession, and we decline to let petitioners now challenge those conceded items. See Rule 91(e) (stating that stipulations are conclusive admissions and binding upon by the parties unless otherwise agreed upon by the parties or allowed by the Court in the interest of justice).

[5]As discussed below, SSD issued Mr. Larkin Schedules K-1 for the subject years that reported, among other things, his share of SSD's ordinary business income and guaranteed payments. Petitioners generally reported those items on Schedules C, Profit or Loss From Business, as if the items were income from Mr. Larkin's sole proprietorship, and they generally did so for 2003 through 2005 net of petitioners' claimed exclusions under sec. 911. Although petitioners should have reported Mr. Larkin's share of SSD's ordinary business income and guaranteed payments on Schedules E, Supplemental Income and Loss, see 2003 through 2006 Partner's Instructions for Schedules K-1 (Form 1065), at 6-7, our

(continued...)

**[*4]** respondent's concession that section 911 allows petitioners to exclude $80,000 from their gross income for each of 2003, 2004, and 2005 and $82,500 for 2006;

2. whether petitioners failed to report for 2006 a $23,406 distribution from an individual retirement account (IRA). We hold they did;

3. whether petitioners failed to report Mr. Larkin's distributive shares of ordinary income from SSD of $16,543 and $29,734 for 2003 and 2005, respectively. We hold that petitioners reported the $16,543 distributive share for 2003 but failed to report the $29,734 distributive share for 2005;

4. whether petitioners may deduct the self-employment expenses that respondent disallowed for the subject years. We hold they may deduct only the amounts stated herein;

5. whether petitioners may deduct $8,610 of rental expenses for 2003. We hold they may not;

6. whether petitioners may deduct the itemized deductions that respondent disallowed for the subject years. We hold they may deduct only the amounts stated herein;

---

[5](...continued)
conclusions would remain the same regardless of whether that income was reported on Schedules C or on Schedules E.

**[*5]**   7.  whether petitioners are liable for self-employment taxes for the subject years as determined by respondent.  We hold they are;

8.  whether petitioners may claim the foreign tax credits that respondent disallowed for the subject years.  We hold they may not;

9.  whether petitioners are liable for section 6662(a) accuracy-related penalties for the subject years.  We hold they are; and

10.  whether petitioners are liable for section 6651(a) (1) additions to tax for 2003 and 2005.  We hold they are.[6]

## FINDINGS OF FACT

I.   <u>Preliminaries</u>

The parties stipulated certain facts and exhibits.  We find the stipulated facts accordingly, and we incorporate those facts and exhibits herein.  Petitioners were married and jointly filed a Form 1040, U.S. Individual Income Tax Return (return), for each subject year.  They are U.S. citizens, and they resided in the United Kingdom (U.K.) when their petitions were filed.

---

[6]The parties also dispute whether respondent properly reduced petitioners' deductions for exemptions pursuant to sec. 151(d)(3).  The resolution of this issue is a computational adjustment that flows from our disposition of the other issues.

[*6] II.    Petitioners' Employment, Compensation, Other Business Activities, and Residence

A.    Mr. Larkin

Mr. Larkin is an attorney who during the subject years worked in the U.K. as a partner for the multinational law firm SSD, earning--as discussed in more detail below--more than $400,000 for each subject year.  Before joining SSD at some point in 2001,[7] Mr. Larkin was employed at Price Waterhouse Coopers LLP (PWC) in the U.K., from at least as early as sometime in 1999 through June 28, 2001.  While at PWC, Mr. Larkin earned the following amounts and paid the following U.K. income taxes in U.K. pounds (hereafter £) on the basis of a fiscal year ending (FYE) March 31:

| FYE | Amount earned | U.K. taxes paid |
|-----|---------------|-----------------|
| 2000 | £256,701 | £95,990 |
| 2001 | 264,715 | 98,836 |
| 2002 | 64,317 | 24,088 |

Mr. Larkin's services for SSD during the subject years included, in addition to legal services, providing business consulting services and related advice and serving as a director on the boards of one or more companies that were SSD's

_____

[7]Mr. Larkin's previous employer's records document that he left that employer on June 28, 2001.

[*7] clients. Some of SSD's clients assigned to Mr. Larkin were his clients before he joined SSD. Those clients continued with Mr. Larkin after he joined SSD because he and SSD agreed that Mr. Larkin would continue to serve those clients personally (but in his capacity as an SSD partner).

For each subject year, Mr. Larkin received payments from SSD that were, for purposes of partnership taxation rules, "guaranteed payments". Mr. Larkin participated in a pension plan (a Keogh plan) that was funded through SSD, and $28,000 and $29,000 of his distributions from SSD were contributed to that plan on his behalf during 2003 and 2006, respectively.

Mr. Larkin also worked in the U.K. during the subject years in a real estate business (real estate business) that he operated as a sole proprietorship. None of petitioners' returns for the subject years identified the real estate business by name, by principal business, or by product or service, and none included a Schedule C that specifically reported any income or expense attributable to the real estate business.[8] Mr. Larkin first transferred funds to the real estate business during

---

[8]Respondent concedes that the real estate business was a "business" within the meaning of sec. 162. Petitioners occasionally suggest that both of them operated the business, but in the main refer to it as Mr. Larkin's business, and we so find. Petitioners are also equivocal on the product(s) and/or service(s) that the real estate business provided during the subject years. At trial, Mr. Larkin variously referred to the real estate business as a real estate trading business, a business consulting and real estate development business, a real estate investment

(continued...)

[*8] 2003, and he (through the real estate business) used those funds to buy property that petitioners sold in 2007.

B.    Mrs. Larkin

Mrs. Larkin reported her occupation as "housewife" or "homemaker" on petitioners' 2003 through 2005 returns and left her occupation blank on their 2006 return.

C.    Petitioners' residence

Petitioners' U.K. residence during the subject years was in Claygate, England.[9]

D.    Treetops

Treetops, L.L.C. (Treetops), was a limited liability company that petitioners and another couple formed under Wisconsin law in or about 1996 for the purpose of holding a vacation home on a lake in Wisconsin. During the subject years, Treetops' owners were petitioners and the other couple, with petitioners having

_____

[8](...continued)
business, and a business consulting and real estate development business. We find that Mr. Larkin's sole proprietor business was a real estate development business.

[9]Petitioners moved sometime in 2007 to an address in Cobham, England, as they provided that address on their 2006 return, which was filed on August 14, 2007. However, one of petitioners' utility bills in the record establishes that they were paying utilities at the Claygate address through December 31, 2006.

[*9] 65% of Treetops' equity interests, and the other couple having the remainder. Treetops did not report any income for the subject years.

III.    2003 Through 2006 Returns

    A.    2003

        1.    Overview

Petitioners filed their 2003 return on May 22, 2005.  The 2003 return in relevant part includes the following documents:  (1) a completed Form 1040, (2) a completed Schedule A, Itemized Deductions, (3) a completed Schedule C, (4) a completed Schedule E, (5) a completed Form 1116, Foreign Tax Credit, (6) a completed Form 2555, Foreign Earned Income, (7) a completed Form 4684, Casualties and Thefts, (8) a 2003 California Schedule K-1, Partner's Share of Income, Deductions, Credits, etc. (California schedule K-1), that SSD issued to Mr. Larkin and which lists amounts from the 2003 Schedule K-1 that SSD issued to Mr. Larkin,[10] (9) a two-page "Sch K-1 Supporting Schedules" statement relating to the 2003 Schedule K-1 that SSD issued to Mr. Larkin, (10) a one-page schedule listing "Deductible Items Withheld in 2003" that SSD issued to Mr. Larkin, (11) a Schedule K-1 that Treetops issued to Mr. Larkin for 2003, (12) a Schedule K-1 that Treetops issued to Mrs. Larkin for 2003, and (13) a statement accompanying the

_____

[10]Petitioners' 2003 return does not include a copy of the 2003 Schedule K-1 that SSD issued to Mr. Larkin.

**[*10]** Schedules K-1 from Treetops, listing Treetops' expenses for 2003 (mortgage interest and property taxes) and the "Member's Share" of each expense (and the total thereof).

### 2. Form 1040

Petitioners reported on their Form 1040 that their total income for 2003 was $98,161, consisting of $105,361 of income from Mr. Larkin's self-employment and a $7,200 loss from rental real estate. They claimed that they were entitled to deduct $75,196 of itemized deductions and $15,250 for personal exemptions, leaving them with taxable income of $7,715. They reported that they were subject to tax (including the alternative minimum tax) of $7,381 and that they were entitled to claim a $7,381 foreign tax credit that completely offset that tax.

### 3. Schedule A

Petitioners claimed on the Schedule A that their itemized deductions consisted of the following items and corresponding amounts:

| [*11] | Item | Amount |
|---|---|---|
| | Real estate taxes | $7,637 |
| | Home mortgage interest and points | 59,095 |
| | Gifts by cash or check | 2,200 |
| | Casualty or theft loss | 4,800 |
| | Other expenses[1] | 1,400 |
| | Total | [2]75,196 |

[1]Petitioners did not specifically identify these other expenses.
[2]While petitioners reported that these items total $75,196, they actually total $75,132.

4.    Schedule C

Petitioners reported on the Schedule C that Mr. Larkin was an attorney working for SSD as a sole proprietor.[11]  The address they reported for the sole proprietorship was an address other than their residence.  Petitioners also reported on this schedule that Mr. Larkin's income and expenses (indicated as computed on an accrual method of accounting) from his self-employment were as follows:

| Income and expenses | Amount |
|---|---|
| Gross receipts | $220,000 |
| Expenses: | |
| Depreciation | 512 |
| Insurance (other than health) | 1,150 |
| Interest (other than mortgage) | 25,700 |
| Office expense | 7,800 |
| Pension and profit-sharing plans | 28,000 |

[11]For each subject year, notwithstanding Mr. Larkin's status as a partner in SSD, petitioners reported items of income and expense from the partnership on a Schedule C.

**[*12]**

| | |
|---|---|
| Rent: vehicles, machinery, and equipment | 3,820 |
| Repairs and maintenance | 3,000 |
| Taxes and licenses | 12,061 |
| Travel | 4,800 |
| Deductible meals and entertainment | 2,150 |
| Utilities | 2,100 |
| Medical | 10,396 |
| Home leave | 7,450 |
| Business use of home[1] | 5,700 |
| Total | 114,639 |
| Net profit | 105,361 |

[1]The Schedule C instructs taxpayers to attach Form 8829, Expenses For Business Use of Your Home, with respect to this expense. Petitioners' 2003 return does not include a Form 8829.

5. Schedule E

Petitioners reported on the Schedule E that they owned an 11.25% interest in a rental real estate property. They reported the following items of income and expense as to that interest:

| Income and expenses | Amount |
|---|---|
| Income: | |
| Rents received | $1,410 |
| Expenses: | |
| Repairs | 2,890 |
| Depreciation | 5,720 |
| Total | 8,610 |
| Net loss | 7,200 |

**[*13]**          6.     <u>Form 1116</u>

Petitioners reported on the Form 1116 that they paid or accrued foreign taxes

of $341,098 from 1999 through 2001.[12]  They also reported that they carried back

or carried over $176,225 of those taxes and had $164,873 of the $341,098

available for credit ($341,098 – $176,225).  They reported that they were entitled

to claim $7,381 of the $164,873 as a foreign tax credit for 2003.

          7.     <u>Form 2555</u>

Petitioners reported on the Form 2555 that Mr. Larkin was an

"Attorney/Real Estate Developer" whom SSD employed during the year and that

Mr. Larkin was for the first time filing a Form 2555 to claim the foreign earned

income and housing costs exclusions.  They also reported that Mr. Larkin received

"2003 Foreign Earned Income" of $404,207 from "wages, salaries, bonuses,

commissions, etc." and paid $115,440 of "qualified housing expenses" for the

year.[13]  They also reported that they were entitled to claim a $104,207 housing

---

[12]The face of the Form 1116 includes a Part II, Foreign Taxes Paid or
Accrued.  Part II includes two boxes, one labeled "Paid" and the other labeled
"Accrued", and states in bold text right above the boxes that "you must check one"
as to a credit claimed for foreign taxes.  Petitioners reported in Part II that they
paid or accrued $341,098 of foreign taxes from 1999 through 2001, but they did
not indicate by checking the appropriate box whether the taxes were paid or
accrued.

[13]Petitioners calculated the $404,207 by adding the $16,543 of ordinary

(continued...)

[*14] exclusion and an $80,000 foreign earned income exclusion, for a total exclusion of $184,207. The $220,000 of gross income reported on the Schedule C represents the difference between the $404,207 and the $184,207 shown on the Form 2555.

### 8. Form 4684

Petitioners reported on the Form 4684 that the $4,800 casualty or theft loss claimed on their Schedule A related to "Dining Room Ceiling, Alcove, Fixtures". They also reported that their basis in the referenced property was $14,616 before the loss and that the property had no value after the loss.

### 9. Schedules K-1

#### a. SSD

The California schedule K-1 attached to the return indicated that the 2003 Schedule K-1 reported that Mr. Larkin's partnership shares of SSD's ordinary business income, of SSD's net income from rental real estate activities, of SSD's interest income, and of SSD's dividend income were $16,543, $427, $20, and $1, respectively, and that his guaranteed payments totaled $387,766. The California schedule K-1 also indicated that the 2003 Schedule K-1 reported that Mr. Larkin's

_____

[13](...continued)
income and $387,766 of guaranteed payments shown on the Schedule K-1 that SSD issued to Mr. Larkin (discussed below) and then subtracting the sum of a $1 loss plus $101 in charitable contributions also shown on that schedule.

[*15] share of SSD's net loss with respect to capital assets was $1 and that his share of SSD's charitable contributions was $101. The two-page statement attached to the return reported among other things that "Contributions to Pension Plan" totaled $28,000. The one-page schedule attached to the return reported as to Mr. Larkin that, among other things, SSD had withheld $8,396 for medical insurance premiums.

b.     Treetops

Treetops issued each petitioner a Schedule K-1 stating that each owned a 32.5% interest in Treetops. Each Schedule K-1 also stated that each petitioner's distributive share of Treetops' deductions was $4,116. A statement included in the return reported that Treetops' mortgage interest and property taxes for the year were $6,300 and $6,364, respectively ($12,664 in total), and that the "Member's Share" of each deduction was $2,048 and $2,068, respectively ($4,116 in total).

B.     2004

1.     Overview

Petitioners' 2004 return in relevant part includes the following documents: (1) a completed Form 1040, (2) a completed Schedule A, (3) a completed Schedule C, (4) a completed Form 2555, (5) a completed Form 4684, (6) a Schedule K-1 that SSD issued to Mr. Larkin and an accompanying one-page "Sch K-1 Supporting

[*16] Schedules" statement with respect to Mr. Larkin, and (7) a completed Form 1065, U.S. Return of Partnership Income, for Treetops, accompanied by a copy of the Schedules K-1 that Treetops issued to its four owners and a statement listing Treetop's deductions for 2004 and each petitioner's share of those deductions. The 2004 return does not include a Form 1116, although petitioners claimed a foreign tax credit of $6,787 on the return.

### 2. Form 1040

Petitioners reported on their Form 1040 that their total income for 2004 was $117,512, consisting solely of income from Mr. Larkin's self-employment. They claimed that they were entitled to deduct $63,298 of itemized deductions and $15,500 for personal exemptions, leaving them with taxable income of $38,714. They reported that they were subject to a tax (including the alternative minimum tax) of $6,787 and, as noted, that they were entitled to claim a $6,787 foreign tax credit that completely offset that tax.

### 3. Schedule A

Petitioners claimed on the Schedule A that their itemized deductions consisted of the following items and corresponding amounts:

[*17]

| Item | Amount |
|---|---|
| Real estate taxes | $8,838 |
| Home mortgage interest and points | 48,640 |
| Gifts by cash or check | 2,930 |
| Casualty or theft losses | 1,430 |
| Other expenses (net of 2% of AGI) | 1,460 |
| Total | 63,298 |

4. Schedule C

Petitioners reported on the Schedule C that Mr. Larkin was an attorney working for SSD as a sole proprietor. They reported the address of the sole proprietorship as an address other than their residence. They also reported that Mr. Larkin's income and expenses (as computed on an accrual method of accounting) from his self-employment were as follows:

| Income and expenses | Amount |
|---|---|
| Gross receipts | $242,000 |
| Expenses: | |
| Depreciation | 670 |
| Insurance (other than health) | 1,350 |
| Interest (other than mortgage) | 27,610 |
| Office expense | 8,370 |
| Pension and profit-sharing plans | 28,000 |
| Rent: Vehicles, machinery, and equipment | 4,320 |
| Repairs and maintenance | 5,390 |
| Taxes and licenses | 10,927 |
| Travel | 4,670 |
| Deductible meals and entertainment | 1,905 |
| Utilities | 2,485 |
| Medical | 13,941 |

[*18]

| | |
|---|---:|
| Home leave | 8,680 |
| Business use of home | 6,170 |
| Total | 124,488 |
| Net profit | 117,512 |

5.    Form 2555

Petitioners reported on the Form 2555 that Mr. Larkin was an attorney whom SSD employed during the year.  They also reported that Mr. Larkin received "2004 Foreign Earned Income" of $416,606 from "wages, salaries, bonuses, commissions, etc." and paid $106,213 of "qualified housing expenses" for the year.[14]  They also reported that they were entitled to claim a $94,632 housing exclusion and an $80,000 foreign earned income exclusion, for a total exclusion of $174,632.  The $242,000 of gross income reported on the Schedule C equals the $416,606 "wages' reported on the Form 2555, plus Mr. Larkin's $26 distributive share of interest income reported on the Schedule K-1 that SSD issued to him, minus the $174,632 exclusion claimed on the Form 2555.

---

[14]Petitioners apparently calculated the $416,606 in wages by adding the $415,880 of guaranteed payments and the $726 of rental real estate income shown on the Schedule K-1 that SSD issued to Mr. Larkin (discussed below).  The parties have stipulated that petitioners failed to report this $726, but we conclude that this stipulation is contrary to the facts.  See Rule 91(e); Jasionowski v. Commissioner, 66 T.C. 312, 318 (1976).

**[*19]**      6.      Form 4684

Petitioners reported on the Form 4684 that the $1,430 casualty or theft loss related to a van, a sailboat, garden lighting, and a fourth item that is illegible. They also reported that their bases in these properties before the loss were $50,000, $4,000, $5,000, and $2,800, respectively; that the fair market values of these properties before the loss were $30,000, $2,500, $3,000, and $1,500, respectively; and that the fair market values of these properties after the loss were $23,220, $0, $500, and $0, respectively.

      7.      Schedules K-1

            a.      SSD

The Schedule K-1 that SSD issued to Mr. Larkin for 2004 reported that his partnership shares of SSD's ordinary business income, of SSD's net income from rental real estate activities, of SSD's interest income, and of SSD's dividend income were $30,323, $726, $26, and $94, respectively, and that his guaranteed payments totaled $415,880. The Schedule K-1 also reported that Mr. Larkin's share of the losses from capital assets totaled $555 and that his share of other deductions was $170. The one-page supporting statement repeated the just-stated amounts and characterizations of Mr. Larkin's shares of SSD's net income from rental real estate activities, of SSD's interest income, and of SSD's dividend

[*20] income, as well as his guaranteed payments and a portion of the loss from capital assets, and made no mention of any payment of medical insurance premiums or contribution to Mr. Larkin's pension plan.

### b.    Treetops

Petitioners' 2004 return includes a copy of a Form 1065 for Treetops for 2004.  Treetops' 2004 return reports that Treetops' only item of income or expense was "other deductions" totaling $12,274 and that these deductions consisted of mortgage interest of $5,600 and property taxes of $6,674.  The Schedules K-1 and accompanying statement that Treetops issued to petitioners for 2004 report that each petitioner owned a 32.5% interest in Treetops and that each petitioner's distributive share of the other deductions was $3,989.

### C.    2005

#### 1.    Overview

Petitioners' return was filed on July 16, 2006.  The 2005 return included in relevant part the following documents:  (1) a completed Form 1040, (2) a completed Schedule A, (3) a completed Schedule C, (4) a completed Form 1116, (5) a completed 2005 Form 2555, (6) two Schedules K-1 that Treetops apparently issued to petitioners,[15] and (7) a 2005 Wisconsin schedule 3K-1, Partner's Share of

---

[15]These schedules list certain limited information as to Treetops but do not

(continued...)

[*21] Income, Deductions, etc. (Wisconsin schedule 3K-1), that Treetops issued to Mrs. Larkin. Petitioners did not attach to their 2005 return a Schedule K-1 from SSD or any schedule or statement that SSD prepared with respect to that year.

### 2. Form 1040

Petitioners reported on their Form 1040 that their total income for 2005 was $98,650, consisting solely of income from Mr. Larkin's self-employment. They claimed that they were entitled to deduct $65,472 of itemized deductions and $16,000 for personal exemptions, leaving them with a taxable income of $17,178. They reported that they were subject to tax (including the alternative minimum tax) of $3,013 and that they were entitled to claim a $3,013 foreign tax credit that completely offset that tax.

### 3. Schedule A

Petitioners reported on the Schedule A that their itemized deductions consisted of the following items and corresponding amounts:

---

[15](...continued) report any amounts of income, deductions, or credits. Nor do they state to whom they were issued.

[*22]

| Income and expenses | Amount |
|---|---|
| Real estate taxes | $8,970 |
| Home mortgage interest and points | 51,310 |
| Gifts by cash or check | 2,790 |
| Other expenses (net of 2% of AGI) | 2,408 |
| Total | [1]65,472 |

[1]While petitioners reported that these items total $65,472, they actually total $65,478.

4.    Schedule C

Petitioners reported on the Schedule C that Mr. Larkin was an attorney working for SSD as a sole proprietor. They reported the address of the sole proprietorship as an address other than their residence. They also reported that Mr. Larkin's income and expenses (as computed on an accrual method of accounting) from his self-employment were as follows:

| Income and expenses | Amount |
|---|---|
| Gross receipts | $234,000 |
| Expenses: | |
| Depreciation | 720 |
| Insurance (other than health) | 1,470 |
| Interest (other than mortgage) | 31,370 |
| Office expense | 8,730 |
| Pension and profit-sharing plans | 28,000 |
| Rent:  Vehicles, machinery, and equipment | 4,770 |
| Repairs and maintenance | 5,720 |
| Taxes and licenses | 11,540 |
| Travel | 6,380 |
| Deductible meals and entertainment | 3,210 |

[*23]

| | |
|---|---:|
| Utilities | 2,730 |
| Medical | 14,270 |
| Home leave | 9,570 |
| Business use of home | 6,870 |
| Total | 135,350 |
| Net profit | 98,650 |

5.    Form 1116

Petitioners reported on the Form 1116 that they paid or accrued foreign taxes of $341,098 from 1999 through 2001.[16]  They also reported that they carried back or carried over $183,012 of those taxes and thus had $158,086 of the $341,098 available for credit.  They reported that they were entitled to claim $6,572 of the $158,086 as a foreign tax credit for 2005.

6.    Form 2555

Petitioners reported on the Form 2555 that Mr. Larkin was an attorney employed at SSD during the year and that he received "2005 Foreign Earned Income" from "wages, salaries, bonuses, commissions, etc." of $407,860--the figure SSD reported as Mr. Larkin's guaranteed payments on the Schedule K-1

---

[16]As previously discussed as to the 2003 Form 1116, the face of the 2005 Form 1116 contains the same box and instructions with respect to reporting whether the claimed foreign taxes were paid or accrued.  Petitioners reported in Part II of the 2005 Form 1116 that they paid or accrued $341,098 of foreign taxes from 1999 through 2001, but they did not indicate by checking the appropriate box whether the taxes were paid or accrued.

[*24] issued to him.[17]  Petitioners further reported that they paid $109,770 of "qualified housing expenses" for the year, entitling them to claim a $97,876 housing exclusion which, when added to an $80,000 foreign earned income exclusion, entitled them to a total exclusion of $177,876.  The $234,000 of gross income reported on the Schedule C represents the approximate difference between the $407,860 and the $177,876 shown on the 2005 Form 2555.[18]  The Form 2555 instructed petitioners to report the $177,876 in parentheses on the front of Form 1040 as an item of other income and then to subtract the $177,876 from their income to arrive at their total income.

      7.     Schedules K-1

          a.     SSD

SSD issued Mr. Larkin a Schedule K-1 for 2005 which reported that his partnership shares of SSD's ordinary business income, of SSD's net income from rental real estate activities, and of SSD's interest income were $29,734, $723, and

---

[17]In contrast with their reporting on the 2003 Form 2555, petitioners did not include in the foreign earned income reported on the 2005 Form 2555 Mr. Larkin's distributive share of SSD's ordinary income of $29,734, as reported to him on the 2005 Schedule K-1 issued to him by SSD.

[18]The parties have not explained the $4,016 discrepancy between the $234,000 of reported gross income and the $229,984 figure that results when $407,860 of foreign earned income reported on the Form 2555 is reduced by $177,876 foreign earned income exclusion reported on that form.

**[\*25]** $60, respectively, and that his guaranteed payments totaled $407,860. The Schedule K-1 also reported that Mr. Larkin's share of gains from capital assets totaled $9.

### b. Treetops

Petitioners attached to their 2005 return a Wisconsin schedule 3K-1 that Treetops issued to Mrs. Larkin for 2005. The schedule reported that Mrs. Larkin owned a 32.5% interest in Treetops and that her distributive share of Treetops' loss for 2005 was $3,852. A statement accompanying the schedule reported that Treetops' deductions were mortgage interest and property taxes of $4,900 and $6,954, respectively ($11,854 in total), and that Mrs. Larkin's share of the total deduction was $3,852.

### D. 2006

#### 1. Overview

Petitioners' 2006 return in relevant part included the following documents: (1) a completed Form 1040, (2) a completed Schedule A, (3) a completed Schedule C, (4) a completed Schedule E, (5) a completed Form 1116, (6) a completed Form 2555, (7) a Schedule K-1 that SSD issued to Mr. Larkin, and an accompanying two-page "Sch K-1 Supporting Schedules" statement relating to Mr. Larkin's interest in SSD, (8) a one-page schedule listing "Deductible Items Withheld in

[*26] 2006" that SSD furnished to Mr. Larkin as to his interest in SSD, and (9) a Schedule K-1 that Treetops issued to Larmodt L.L.C.,[19] with an accompanying statement.

## 2. Form 1040

Petitioners reported on their Form 1040 that their total income for 2006 was $181,546, consisting of $302,271 of income from Mr. Larkin's self-employment, $19,767 of income from Schedule E, and a negative $140,416 adjustment relating to Form 2555.[20] They claimed that they were entitled to deduct $72,559 of itemized deductions and $16,500 for personal exemptions, leaving them with a taxable income of $92,487. They reported that they were subject to a tax (including the alternative minimum tax) of $49,459 and that they were entitled to claim a $49,459 foreign tax credit that completely offset that tax.

## 3. Schedule A

Petitioners claimed on the Schedule A that their itemized deductions consisted of the following items and corresponding amounts:

---

[19]The record does not further identify Larmodt, L.L.C., or its owners.

[20]We note a discrepancy in petitioners' total of $76.

[*27]

| Item | Amount |
|------|--------|
| Real estate taxes | $9,109 |
| Home mortgage interest and points | 57,670 |
| Gifts by cash or check | 3,720 |
| Other expenses (net of 2% of AGI) | 2,060 |
| Total | 72,559 |

4.    Schedule C

Petitioners reported on the Schedule C that Mr. Larkin was an attorney working for SSD as a sole proprietor. They reported the address of the sole proprietorship as an address other than their residence. They also reported that Mr. Larkin's income and expenses (as computed on an accrual method of accounting) from his self-employment were as follows:

| Income and expenses | Amount |
|---------------------|--------|
| Gross receipts | $440,354 |
| Expenses: | |
| Depreciation | 765 |
| Insurance (other than health) | 1,510 |
| Interest (other than mortgage) | 23,710 |
| Office expense | 8,420 |
| Pension and profit-sharing plans | 28,000 |
| Rent: vehicles, machinery, and equipment | 4,670 |
| Repairs and maintenance | 6,170 |
| Taxes and licenses | 12,240 |
| Travel | 6,820 |
| Deductible meals and entertainment | 3,730 |
| Utilities | 2,940 |
| Medical | 15,330 |
| Home leave | 10,090 |

[*28]

| | |
|---|---|
| Business use of home | 7,070 |
| Total | [1]137,765 |
| Net profit | [2]302,271 |

[1]While petitioners reported that these items total $137,765, they actually total $131,465.

[2]While petitioners reported the net profit as $302,271, the reported gross income of $440,354 less the reported total expenses of $137,765 equals $302,589. The reported gross income less the correct total of the reported expenses, $131,465, equals $308,889.

5.    Schedule E

Petitioners reported on the Schedule E the following items of income:

| Income | Amount |
|---|---|
| Income from Partnerships and S Corporations: | |
| LFP | $1,937 |
| Income from Estates and Trusts: | |
| Barb & James Larkin | 17,830 |
| Total | 19,767 |

6.    Form 1116

Petitioners reported on the Form 1116 that they paid or accrued foreign taxes of $341,098 from 1999 through 2001.[21] They reported that they carried back or carried over $186,025 of those taxes and thus had $155,073 of the $341,098

---

[21]As we previously discussed in the case of the 2003 and 2005 Forms 1116, the face of the 2006 Form 1116 contains the same box and instructions with respect to reporting whether the claimed foreign taxes were paid or accrued. Petitioners reported in Part II of the 2006 Form 1116 that they paid or accrued $341,098 of foreign taxes from 1999 through 2001, but they did not indicate by checking the appropriate box whether the taxes were paid or accrued.

[*29] available for credit.  Petitioners did not report on the form that they were claiming any portion of the $155,073 as a foreign tax credit for 2006, although they claimed a $49,459 foreign tax credit on their Form 1040 that completely offset the tax reported as due.

7.     Form 2555

Petitioners reported on the Form 2555 that Mr. Larkin was employed by SSD during 2006 (without specifying his occupation).  They also reported that Mr. Larkin received "2006 Foreign Earned Income" of $440,354 from "wages, salaries, bonuses, commissions, etc." and paid $112,420 of "qualified housing expenses" for the year.[22]  They also reported that they were entitled to claim a $58,016 housing exclusion and an $82,400 foreign earned income exclusion, for a total exclusion of $140,416.  They reported and subtracted the $140,416 on the front of their Form 1040 as "other income" from "Form 2555" to arrive at their total income.

---

[22]Petitioners apparently calculated the $440,354 by adding the $385,331 of Mr. Larkin's guaranteed payments reported on the Schedule K-1 that SSD issued to him (discussed below) and his $55,026 share of ordinary income also reported on that schedule.  The record does not disclose the source of the $3 discrepancy between the sum of $385,331 + $55,026, or $440,357, and the reported $440,354.

**[*30]**     8.     Schedules K-1

          a.     SSD

The Schedule K-1 that SSD issued to Mr. Larkin for 2006 reported that Mr. Larkin's shares of SSD's ordinary business income, of SSD's net income from rental real estate activities, of SSD's interest income, and of SSD's dividend income were $55,026, $1,397, $94, and $340, respectively, and that his guaranteed payments totaled $385,331. The Schedule K-1 also reported that Mr. Larkin's share of SSD's net losses from capital assets totaled $558 and that his share of SSD's other deductions was $384. The two-page statement reported among other things that "Contributions to Keogh Plan" totaled $29,000. The one-page schedule reported as to Mr. Larkin that, among other things, SSD had withheld $0 for medical insurance premiums.

          b.     Treetops

Petitioners' 2006 return includes a Schedule K-1 that Treetops issued to Larmodt L.L.C. for 2006. It does not include any Schedule K-1 issued to either petitioner by Treetops for that year.

**[\*31]** IV.     <u>IRA Distribution</u>

Petitioners received a $23,406 distribution during 2006 from an IRA at Morgan Stanley Dean Witter, Inc.  A distribution in this amount is not specifically identified on petitioners' 2006 return or on any schedule attached thereto.

V.     <u>IRS Revenue Officer</u>

On or about February 18, 2005, an Internal Revenue Service (IRS) revenue officer mailed to petitioners a letter advising them that the IRS was attempting to collect unpaid tax from them.  Approximately two weeks later, he sent petitioners another letter, setting a meeting with them for April 13, 2005, at the U.S. Embassy in London to discuss unpaid amounts and unfiled returns.  This letter noted that IRS records showed that petitioners had not filed Federal income tax returns for 2000, 2002, or 2003 and owed over $64,000 as to 2000 and 2002 (inclusive of income taxes, interest, and penalties).  Mr. Larkin met with the revenue officer as scheduled, and they discussed petitioners' 2002, 2003, and 2004 taxable years, as well as petitioners' estimated tax payments for 2005.

VI.     <u>Time Allotted for Trial Preparation and Notice Regarding Documentary Evidence</u>

With respect to their docketed case covering their 2003 and 2004 taxable years, petitioners were given five months advance notice of their scheduled trial date.  The standing pretrial order accompanying that notice advised petitioners that

[*32] any documentary evidence that a party expected to use at trial (except for impeachment purposes) and that had not been stipulated "shall be identified in writing and exchanged by the parties at least 14 days before the first day of the trial session." The initial trial date was approximately 13 months after respondent issued the notice of deficiency for those years.[23] Shortly before the initial trial date, the parties jointly moved for a continuance, on the grounds that petitioners needed additional time to secure documents to substantiate their claimed foreign tax credits. The Court granted a continuance, with the result that the trial was postponed an additional 16 months. In sum, the trial occurred almost 2.5 years after issuance of the notice of deficiency and 16 months after petitioners received a continuance to afford them additional time to obtain documents. With respect to their docketed case covering the 2005 and 2006 taxable years, the comparable period between issuance of the notice of deficiency and the trial date was more than 13 months.

---

[23]The parties stipulated that respondent issued the notice of deficiency for 2003 and 2004 on March 30, 2009, and the notice of deficiency for 2005 and 2006 on April 24, 2008. The notices of deficiency are stipulated exhibits. A review of the notices of deficiency reveals an obvious error in the parties' stipulations concerning the issuance dates: They are reversed. We therefore find contrary to the stipulations that the 2003/2004 notice of deficiency was issued on April 24, 2008, and the 2005/2006 notice of deficiency was issued on March 30, 2009. See Gerdau MacSteel, Inc. v. Commissioner, 139 T.C. 67, 144 n.55 (2012) (Court may disregard a stipulation that is clearly contrary to the record).

**[\*33]**                                        OPINION

I.    Overview

Respondent made various determinations in these cases, and petitioners'
opening brief challenges some (but not all) of the determinations. We consider any
issue or argument that petitioners did not advance on brief as having been
abandoned, see Mendes v. Commissioner, 121 T.C. 308, 312-313 (2003); Nicklaus
v. Commissioner, 117 T.C. 117, 120 n.4 (2001); Rybak v. Commissioner, 91 T.C.
524, 566 n.19 (1988), and we decide only the issues that petitioners address on
brief. We pause first to discuss the credibility of the sole witness, Mr. Larkin, and
the burden of proof. We then turn to the determinations at issue and redetermine
them seriatim.

II.   Witness Credibility

We consider Mr. Larkin's credibility for purposes of evaluating his
testimony. We then weigh his testimony and each piece of documentary evidence,
draw appropriate inferences, and choose between conflicting inferences in finding
the facts in these cases. The mere fact that Mr. Larkin's testimony was unopposed
does not mean that we will make findings consistent with it. We will not accept
the testimony of witnesses at face value to the extent it is implausible or not
credible in view of the totality of the surrounding circumstances. See Neonatology

**[\*34]** <u>Assocs., P.A. v. Commissioner</u>, 115 T.C. 43, 84 (2000), <u>aff'd</u>, 299 F.3d 221 (3d Cir. 2002).

We generally found Mr. Larkin's testimony to be unconvincing. He routinely testified vaguely or in a conclusory manner, or with an obviously self-serving motive. We generally do not rely on Mr. Larkin's testimony to support petitioners' positions in these cases, except to the extent his testimony is corroborated by reliable documentary evidence.

III.    Burden of Proof

Petitioners contend that respondent bears the burden of proof, for two reasons. Petitioners primarily argue that respondent bears the burden of proof under section 7491(a). To that end, they assert that they presented at trial "[f]ully credible evidence respecting underlying factual issues * * * and all other evidence and records required to support claims were made available to the Service during the examination and review process (and remains available to this day)". They also assert that the examining agent declined to review documentation that they presented during the examination and that respondent's counsel objected at trial to the introduction of documents eventually not included in evidence. They argue secondarily that the burden of proof is on respondent because respondent's determination is without any foundation. They assert that the determination lacks a

**[\*35]** foundation because the IRS declined to conduct an appropriate examination under the rules applicable to taxpayers residing abroad.

We do not agree that respondent bears the burden of proof. The Commissioner's determinations set forth in a notice of deficiency are generally presumed correct. Welch v. Helvering, 290 U.S. 111, 115 (1933); see also Rule 142(a)(1). Section 7491(a)(1), however, provides an exception that shifts the burden of proof to the Commissioner as to any factual issue relevant to a taxpayer's liability for income tax if (1) the taxpayer introduces credible evidence with respect to the issue and (2) the taxpayer has satisfied certain other conditions, including that he has complied with the substantiation requirements for any item set forth in the Code and has maintained all records required by the Code. See sec. 7491(a)(1) and (2). A taxpayer bears the burden of proving that he has met the requirements of section 7491(a). Rolfs v. Commissioner, 135 T.C. 471, 483 (2010), aff'd, 668 F.3d 888 (7th Cir. 2012). In addition, a showing by the taxpayer that a determination is arbitrary, excessive, or without foundation also may shift the burden of proof to the Commissioner. See Helvering v. Taylor, 293 U.S. 507, 515-516 (1935); Palmer v. U.S. IRS, 116 F.3d 1309, 1312 (9th Cir. 1997); Berkery v. Commissioner, 91 T.C. 179, 186 (1988), aff'd without published opinion, 872 F.2d 411 (3d Cir. 1989).

**[*36]** Petitioners have not persuaded us that either section 7491(a) or the "arbitrary, excessive, or without foundation" rule applies. As to the former, section 6001 requires taxpayers to maintain such records as prescribed by the Secretary, and he has done so in regulations that direct the maintenance of records "sufficient to establish the amount of gross income, deductions, credits, or other matters required to be shown" in an income tax return. Sec. 1.6001-1(a), Income Tax Regs. Petitioners have not established that they have met this requirement as to any of the subject years.[24] While they introduced some documents at trial in support of their claimed deductions and credits, and Mr. Larkin testified that he had other documents at home in England, the introduced documents and testimony do not satisfy petitioners' burden to establish for purposes of section 7491(a) that they maintained the necessary records as to the deductions and credits at issue.

Nor have petitioners met the credible evidence requirement. Credible evidence is evidence that, after critical analysis, the Court would consider sufficient to decide an issue for the party presenting the evidence, if no contrary evidence were submitted; and we have previously held that a taxpayer who provides only self-serving testimony and inconclusive documentation failed to

---

[24]In addition, as we hold below, petitioners have generally failed to satisfy the substantiation requirements of the Code as to the disputed deductions or credits for each subject year.

**[*37]** provide credible evidence.  See Higbee v. Commissioner, 116 T.C. 438, 442, 443-446 (2001); see also Blodgett v. Commissioner, 394 F.3d 1030, 1035-1039 (8th Cir. 2005) (holding the same), aff'g T.C. Memo. 2003-212.  While petitioners blame respondent for the lack of necessary evidence in the record (e.g., asserting that during the examination they made additional documents available to the IRS and that respondent's counsel objected to the introduction of documentation into evidence), the responsibility to produce the requisite admissible evidence rests with petitioners.  Mr. Larkin is an experienced attorney and during the subject years was a partner in a large multinational law firm.  He surely understood the necessity to maintain documentation and to produce it at trial (as well as in the examination) to support petitioners' claims.  His claim at the trial that he had additional documents at home rings especially hollow, given his professional background.

We also are unpersuaded by petitioners' claim that respondent's determination lacked the requisite foundation because, as they maintain, the IRS declined to conduct an appropriate examination under the rules that apply for taxpayers residing abroad.  The Court generally will not look behind a notice of deficiency to examine the propriety of the Commissioner's motives or the evidence used or procedures involved in making the determinations reflected in a notice of deficiency.  See Greenberg's Express, Inc. v. Commissioner, 62 T.C. 324, 327

**[*38]** (1974) (refusing to examine the Commissioner's failure to provide an Appeals conference). A trial in this Court commenced in challenge of a notice of deficiency is a proceeding de novo to redetermine a taxpayer's correct tax liability. Taxpayers such as petitioners have the opportunity to include in the record any document, testimony, or other evidence that is relevant, even if it was not previously accepted or considered by the IRS during the examination, as long as it is admissible under the applicable procedures and rules. We base our findings and holdings on the merits of these cases and not on any previous record developed at the administrative level. See id. at 328.

We conclude that petitioners bear the burden of proof as to the deficiencies, and we hold accordingly.

IV.    Exclusions for Foreign Earned Income and Housing Costs

As reflected in our findings, petitioners reported Mr. Larkin's guaranteed payments in each subject year on their Schedules C as gross receipts. For each subject year except 2006, they reported as gross receipts the guaranteed payments net of the section 911 foreign earned income and housing cost exclusions that they claimed for each year. In the notices of deficiency, respondent treated the "gross receipts" figures from each year's Schedule C as petitioners' reported guaranteed payments and adjusted the amounts for each subject year except 2006 to make

[*39] them consistent with the guaranteed payment amounts reported by SSD on the Schedules K-1 issued to Mr. Larkin, effectively disallowing any exclusions under section 911. For 2006 petitioners reported the entire amount of Mr. Larkin's guaranteed payments as "gross receipts" on their Schedule C; that is, without netting out their claimed section 911 exclusion. Instead, Mr. Larkin's guaranteed payments from SSD are, generally speaking, "partnership items". See sec. 6231(a)(3); sec. 301.6231(a)(3)-1(a)(2), Proced. & Admin. Regs. Consequently, petitioners were, generally speaking, required either to treat the guaranteed payments on their returns for the subject years consistently with the SSD partnership returns or to file statements identifying the inconsistency. See sec. 6222(a) and (b). Petitioners having failed either to report the guaranteed payments consistently with the Schedules K-1 issued by SSD or to file statements identifying the inconsistencies, respondent was entitled to make computational adjustments to conform petitioners' reporting of the guaranteed payment amounts with the Schedules K-1 issued by SSD, without having to initiate a partnership level proceeding with respect to SSD pursuant to section 6225. See sec. 6222(c).

However, petitioners' return positions for all subject years except 2006--in which they reported the guaranteed payment amounts after netting out a foreign earned income and housing exclusion for each year--constitute claims that they are

**[\*40]** entitled to exclude a portion of the guaranteed payments in each such year pursuant to section 911.[25] Their eligibility for such exclusions requires partner level determinations, entitling them to deficiency procedures to resolve the issue. See sec. 6230(a)(2)(A)(i); Woody v. Commissioner, 95 T.C. 193 (1990).

Generally, a U.S. citizen whose tax home is in a foreign country and who is a bona fide resident of a foreign country for an uninterrupted period that includes an entire taxable year may elect to exclude from gross income his "foreign earned income" and to exclude or deduct (depending upon whether he is an employee or self-employed) his "housing cost amount", up to certain maximum amounts. See sec. 911.

Respondent now concedes that petitioners are entitled to the maximum foreign earned income exclusion under section 911 for each subject year. Reflecting that concession, we hold that petitioners are entitled to exclude $80,000 from income for each of 2003, 2004, and 2005 and $82,400 for 2006, pursuant to section 911. Respondent disputes, however, that petitioners are in addition entitled to any exclusion for housing costs under that section. For the reasons discussed below, we agree with respondent.

---

[25]Their claim to a sec. 911 exclusion for 2006 was reported on the return as a negative adjustment to "other income" on line 21 of the Form 1040, as respondent's instructions for that Form provide.

[*41] The parties each frame their dispute as concerning whether petitioners may

exclude any housing cost amounts for each subject year.  But, as respondent argues

elsewhere with respect to Mr. Larkin's liability for self-employment taxes,

Mr. Larkin was self-employed during the subject years, and consequently the only

housing cost benefits to which petitioners may be entitled are deductions of those

amounts pursuant to section 911(c)(3)(A).[26]  Under that section, a self-employed

individual's housing cost amount may be deducted in computing adjusted gross

income, subject to certain limitations not applicable here.[27]

A taxpayer's housing cost amount comprises the "housing expenses" paid or

incurred during the taxable year for the taxpayer's foreign housing above a "base

housing amount" floor.[28]  Sec. 911(c)(1); sec. 1.911-4(a), (c), Income Tax Regs.

---

[26]Sec. 911(c) was amended in 2006 by inserting a new paragraph (2) and consequently redesignating former paragraphs (2) and (3) as paragraphs (3) and (4), respectively, and by modifying, inter alia, the base housing amount floor of sec. 911(c)(1), discussed further infra.  Tax Increase Prevention and Reconciliation Act of 2005 (TIPRA), Pub. L. No. 109-222, sec. 515(b)(1) and (2)(B), 120 Stat. at 367.  Thus, what was formerly sec. 911(c)(3)(A) is now codified as sec. 911(c)(4)(A).  These amendments were effective for taxable years beginning after December 31, 2005.  TIPRA sec. 515(d), 120 Stat. at 368.  Thus they are applicable for petitioners' 2006 taxable year.  Unless otherwise noted, references hereafter are to sec. 911(c) before its amendment in 2006.

[27]See sec. 911(c)(3)(B) for the housing cost amount deduction limitations.

[28]Beginning in 2006, the housing expenses which may be included in calculating a taxpayer's housing cost amount are further limited by a ceiling

(continued...)

[*42] For taxable years 2003 through 2005 the base housing amount floor is determined by multiplying 16% of the salary of a U.S. employee compensated at an annual rate of grade GS-14, step 1, by a fraction representing the number of days during the taxable year in which the taxpayer's tax home is in a foreign country and the taxpayer satisfies either the bona fide residence test of section 911(d)(1)(A) or the presence test of section 911(d)(1)(B).[29] Sec. 911(c)(1)(B). For the 2006 taxable year the base housing amount floor is determined by multiplying 16% of the foreign earned income exclusion amount by that same fraction. Id.

Petitioners have offered four sets of invoices to substantiate expenses incurred in connection with their U.K. residence during the subject years: (1) mortgage interest payments, (2) local property tax payments, (3) utility payments, and (4) home repair and maintenance payments. Home mortgage interest and local property tax payments are not eligible housing expenses. See sec. 911(c)(2)(A)(ii). Although utility and maintenance expenses are eligible

---

[28](...continued)
amount prescribed in present sec. 911(c)(2)(A). TIPRA sec. 515(b)(2)(B). However, as discussed infra, since the amount of housing expenses petitioners substantiated for 2006 does not exceed the base housing amount floor, those expenses necessarily do not exceed the sec. 911(c)(2)(A) ceiling, rendering it inapplicable in this case.

[29]There appears to be no dispute, and the record supports, that Mr. Larkin satisfied the bona fide residence test for each of the subject years, which means the multiplying fraction would be 1.

[*43] housing expenses, see sec. 911(c)(2)(A)(i); sec. 1.911-4(b)(1), Income Tax Regs., even if we treat the proffered invoices for those expenses as substantiating the listed amounts as paid, those expenses total only £450, £3,052, £5,453, and £903 for 2003, 2004, 2005, and 2006, respectively. In order to be deductible petitioner's housing expenses for those years must have exceeded base housing amount floors of $11,581, $11,894, $12,191, and $13,184, respectively.[30] After we converted the pound amounts listed in the invoices to dollar figures, giving petitioners the benefit of using the strongest pound to dollar exchange rate that occurred within each subject year,[31] their substantiated housing costs still fall far below the foregoing base housing amount floors, as the substantiated amounts converted to dollars in the manner described would equal $801, $5,951, $10,524,

_____

[30]The salary figures for a U.S. employee compensated at an annual rate of grade GS-14, step 1 for 2003, 2004, and 2005 are available at https://archive.opm.gov/oca/03tables/html/gs.asp, https://archive.opm.gov/oca/04tables/html/gs.asp, and https://archive.opm.gov/oca/05tables/html/gs.asp, respectively. The salary figures for 2003, 2004, and 2005 were $72,381, $74,335, and $76,193, respectively. Taking 16% of those figures yields a base housing amount floor of $11,581, $11,894, and $12,191 for 2003, 2004, and 2005, respectively. Similarly, taking 16% of the foreign earned income exclusion amount for 2006 ($82,400) yields a base housing floor of $13,184.

[31]We take judicial notice of the following exchange rates as the strongest pound to dollar rates that occurred during 2003, 2004, 2005, and 2006, respectively (rounded to the nearest cent), as published by the International Monetary Fund: £1 = $1.78, £1 = $1.95, £1 = $1.93, and £1 = $1.98. See http://www.imf.org/external/np/fin/data/param_rms_mth.aspx.

**[\*44]** and $1,788 for the subject years, respectively.  Consequently, petitioners are not entitled to any housing cost amount deductions for the subject years.

V.    IRA Distribution

Petitioners admit in their petition that they received a $23,406 IRA distribution from Morgan Stanley Dean Witter, Inc., in 2006 but contend that it was reported to them on a Schedule K-1 relating to a deceased parent and that they reported the distribution on their 2006 Schedule E.  They point to Part III of their 2006 Schedule E and assert that the distribution is "clearly shown * * * net of the associated tax gross up from the estate".  In Part III petitioners reported a $2,170 "Deduction or loss" and $20,000 of income with respect to a Schedule K-1 related to "Barb + James Larkin".

Petitioners' 2006 return does not include a Schedule K-1 related to "Barb + James Larkin", nor does it include a Schedule K-1 that specifically reports a $23,406 IRA distribution.  We do not find that the IRA distribution is "clearly shown" in the referenced part of Schedule E.  In fact, we decline to find that the $23,406 distribution is reported in the 2006 return at all.[32]  We sustain respondent's determination that petitioners failed to report a $23,406 IRA distribution.

------

[32]While petitioners did report on their 2006 Schedule E that they realized $20,000 of income as to a Schedule K-1 related to "Barb + James Larkin", we are unable to find on the basis of the limited record at hand that the $20,000 is related to the IRA distribution.

**[*45]** VI.   <u>Distributive Share of SSD Partnership Ordinary Income</u>

Respondent determined in the notices of deficiency that petitioners had failed to report Mr. Larkin's distributive shares of ordinary income from SSD of $16,543 and $29,734 for 2003 and 2005, respectively.  SSD issued Schedules K-1 to Mr. Larkin for 2003 and 2005 reporting the foregoing amounts as described. Those distributive shares are "partnership items" within the meaning of section 6231(a)(3).  <u>See</u> sec. 301.6231(a)(3)-1(a)(1)(i), Proced. & Admin. Regs. Consequently, as with the "guaranteed payments" previously discussed, petitioners were required either to treat Mr. Larkin's distributive share of ordinary income from SSD on their 2003 and 2005 returns consistently with the SSD partnership returns (as reported to Mr. Larkin on the Schedules K-1) or to file statements identifying the inconsistency.  <u>See</u> sec. 6222(a) and (b).  They did not file statements identifying any inconsistent reporting for either year.

Respondent's position that petitioners had failed to report Mr. Larkin's distributive shares of ordinary income from SSD would entitle him to make adjustments to petitioners' returns to render them consistent with the Schedules K-1 issued to Mr. Larkin, without having to initiate partnership level proceedings with respect to SSD pursuant to section 6225.  <u>See</u> sec. 6222(c).  As noted, respondent made those adjustments in the notices of deficiency issued to

[*46] petitioners. In these circumstances, we have jurisdiction to adjudicate the effect of these partnership items on petitioners' tax liabilities, as partner level determinations are required to do so. See Blonien v. Commissioner, 118 T.C. 541, 558-559 (2002).

As outlined in our findings, our review of the record persuades us that petitioners reported Mr. Larkin's $16,543 distributive share of SSD's ordinary income for 2003. They did so by including it in the "gross receipts" reported on Schedule C, albeit net of the section 911 exclusion they claimed. We accordingly do not sustain respondent's determination that petitioners failed to report this amount.

We reach the contrary conclusion with respect to 2005. Petitioners argue that, as with 2003, they reported Mr. Larkin's $29,734 distributive share of ordinary income from SSD as part of "gross receipts" on the Schedule C, net of the section 911 exclusion they claimed. On the basis of our review of the figures, we disagree.

Petitioners reported $234,000 of "gross receipts" on their 2005 Schedule C. Given the pattern that is readily apparent in their computation of Schedule C "gross receipts" on the 2003 and 2004 returns, we can surmise that petitioners calculated the 2005 gross receipts figure by subtracting the $177,876 section 911 exclusion

[*47] they claimed on Form 2555 from the $407,860 in guaranteed payments reported to Mr. Larkin on the Schedule K-1. The result is $229,984, which leaves $4,016 of the $234,000 in reported "gross receipts" unaccounted for--a figure too small to encompass petitioners' having reported $29,734 as "gross receipts" before reducing that figure by their claimed section 911 exclusion. Consequently, we sustain respondent's determination that petitioners failed to report Mr. Larkin's distributive share of ordinary income from SSD of $29,734.

VII. Deductions Arising From the Real Estate Business

A. Overview

Petitioners reported on their Schedules C for the subject years that all of Mr. Larkin's self-employment expenses listed thereon were related to his work for SSD as a self-employed attorney. Respondent disallowed petitioners' deductions for all of the reported expenses. Respondent determined primarily that the reported expenses were the partnership's and therefore not deductible by petitioners. See, McLauchlan v. Commissioner, 558 F. App'x 374 (5th Cir. 2014), aff'g and remanding on another issue T.C. Memo. 2011-289; Cropland Chem. Corp. v. Commissioner, 75 T.C. 288, 295 (1980), aff'd without published opinion, 665 F.2d 1050 (7th Cir. 1981). Respondent determined alternatively that petitioners had

[*48] failed to substantiate that the expenses were actually incurred and paid or that the expenses served a business purposes.

Petitioners now argue inconsistently with their reporting on the Schedules C that the expenses--"[w]ith the exception of IRA[33] and medical insurance contributions and some other items required under the relevant partnership agreements to be paid directly by partners"--related to the real estate business. Petitioners assert that Mr. Larkin was a self-employed consultant and real estate developer during the subject years and that these activities were separate from his legal practice.[34] Petitioners assert that all expenses reported on the Schedules C are fully substantiated and deductible, and generally routine and customary.

We disagree with petitioners' claim that they may deduct the expenses reported on their Schedules C for the subject years. Petitioners appear to contend that the expenses should be deductible because they are routine and customary for the business activities in which Mr. Larkin engaged, without regard to whether they have been substantiated. We of course disagree. Petitioners bear the burden

---

[33]Petitioners incorrectly refer to Mr. Larkin's Keogh account as an IRA.

[34]Although it is not clear, it appears that petitioners' position is that amounts that SSD received from Mr. Larkin's former clients were actually realized by Mr. Larkin through his real estate business. We earlier expressed our rejection of Mr. Larkin's testimony to this effect, and we now reject petitioners' related position as well.

**[\*49]** of proving the character and amount of each expense reported and that they incurred and paid them.[35]  See Rule 142(a)(1); INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); Welch v. Helvering, 290 U.S. at 115.

Section 162(a) generally allows a taxpayer to deduct all ordinary and necessary expenses paid or incurred in carrying on a trade or business.  Where those expenses relate to the business use of the taxpayer's residence, he may deduct a portion of residence-related expenses allocable to business use if a portion of the residence is used (1) exclusively on a regular basis, as (2) his business' principal place of business or (3) a place for meeting with customers, clients, or

---

[35]Petitioners argue that by virtue of the fact that they resided abroad, they should be relieved of producing documentation at trial to substantiate the expenses for which they claimed deductions.  However, there is no exception from the obligation to substantiate deductions for taxpayers residing abroad.  We note further in this regard that the standing pretrial order issued to petitioners when these cases were first set for trial advised them of the requirement that documents to be used at trial generally must be exchanged beforehand and that they had an especially lengthy period to prepare for trial.  They were granted a continuance from the original trial date for the express purpose of obtaining additional documentation to support their positions.

Petitioners also suggest for the first time on brief--without support of sworn testimony--that their documents were lost when they moved (apparently in late 2006 or 2007).  In any event, a taxpayer in these circumstances generally must make a reasonable effort to reconstruct substantiation where documents have been lost or destroyed for reasons beyond his control.  See Beck v. Commissioner, T.C. Memo. 2001-198; Smith v. Commissioner, T.C. Memo. 1998-33; Watson v. Commissioner, T.C. Memo. 1988-29.  There is no evidence that petitioners made any such attempt to reconstruct their substantiation.

**[*50]** patients in the normal course of the business.[36] See sec. 280A(c)(1)(A) and

(B); see also Commissioner v. Soliman, 506 U.S. 168, 172-173 (1993).

Trade or business deductions for travel expenses are allowable only if the

taxpayer satisfies the stricter substantiation requirements of section 274(d) in

addition to the requirements of section 162. Under section 274(d), no deduction is

allowed for expenses incurred for travel away from a taxpayer's home (including

meals and lodging) unless the taxpayer substantiates, by adequate records or by

sufficient evidence corroborating the taxpayer's own statement: (1) the amount of

each expense; (2) the time and place of the travel; and (3) the business reason or

expected business benefit from the travel. See sec. 274(d); see also sec.

1.274-5T(b)(2), (c), Temporary Income Tax Regs., 50 Fed. Reg. 46014-46016

(Nov. 6, 1985). The Court may sometimes apply the rule of Cohan v.

Commissioner, 39 F.2d 540 (2d Cir. 1930), to estimate a taxpayer's expenses when

the record does not otherwise establish them but there is a basis upon which to

make a reasonable estimate. See Vanicek v. Commissioner, 85 T.C. 731, 742-743

(1985). But the Cohan rule may not be applied to estimate expenses that are

---

[36]Residence-related expenses also may be deductible where they relate to certain storage space or to certain structures unattached to a dwelling unit. See sec. 280A(c)(1)(C) and (2). Petitioners do not argue that either of those provisions is applicable, and we do not further discuss them.

[*51] subject to section 274(d).  See Sanford v. Commissioner, 50 T.C. 823,

827-828 (1968), aff'd per curiam, 412 F.2d 201 (2d Cir. 1969).

Deductions with respect to certain "listed property", including computers,

are also subject to the strict substantiation rules of section 274.  See secs.

274(d)(4), 280F(d)(4).  Among other requirements, the taxpayer must establish the

amount of each business use and the total use of the listed property during the

taxable period.  Sec. 1.274-5T(b)(6)(i)(B), Temporary Income Tax Regs., 50 Fed.

Reg. 46016 (Nov. 6, 1985).

We turn to the disputed deductions with this law in mind.

B.      Home Office Expenses

Petitioners contend that the expenses reported on the Schedules C for

insurance, office expense, rent, repairs and maintenance, taxes and licenses, and

utilities were paid with respect to their residence and constitute 10% of the total

amounts paid for these items.  They reported 10%, they contend, on account of the

fact that a 300-square-foot spare bedroom in their residence, representing

approximately 10% of the residence's total square footage, was used exclusively

for petitioners' Schedule C real estate business.

We conclude that petitioners have not shown entitlement to deductions for

the business use of their residence.  First, they have produced no substantiation

[*52] whatsoever for most of the foregoing expenses. There is no substantiation for any insurance expense, office expense,[37] rent,[38] or taxes and licenses.[39] That leaves the expenses reported for repairs and maintenance and for utilities, with respect to which petitioners provided various bills and invoices as substantiation. Even if we assume that some portions of these expenses have been substantiated, we conclude that petitioners are not entitled to deduct those portions because they have not established that they met the requirements of section 280A(c)(1)(A) or (B) that their bedroom/office was used exclusively either as the principal place of business for their real estate business or as a place used by clients in the normal course of business.

---

[37]The record includes an invoice for the purchase of a computer and related equipment in 2002. According to Mr. Larkin's testimony, the computer was the source of the depreciation expenses reported on the Schedules C for the subject years. We consider that item infra.

[38]The Schedules C for the subject years indicate that the rent expenses were for "Vehicles, machinery, and equipment". There is no substantiation in the record for rental expenses of any type. (Petitioners also claimed a loss from a rental activity on a Schedule E for 2003, which is considered infra.)

[39]Petitioners offered into evidence two real estate tax bills issued with respect to their U.K. residence for certain of the subject years. According to Mr. Larkin's testimony, however, those bills are offered to substantiate the real estate tax deductions claimed as itemized deductions on petitioners' Schedules A for the subject years.

[*53] We reach the foregoing conclusion on the basis of the preponderance of the evidence. We note first that the address petitioners provided on the Schedule C for each subject year was not their residence but instead the address for the London office of SSD. Mr. Larkin further testified that the real estate business began to generate income in 2003 and that his arrangement with SSD required that revenue from his nonlegal business activities be routed through SSD. We note further that, with two exceptions not pertinent,[40] the only income petitioners reported for the subject years came from SSD. Thus, whatever income the real estate business may have generated was accounted for through SSD. Consequently, we find that, at a minimum, the bookkeeping for the real estate business was conducted at the SSD London office. Mr. Larkin's testimony concerning his spouse's involvement in the real estate business was vague and inconsistent. In any event, to the extent Mrs. Larkin may have participated in the conduct of the business, there was no suggestion that she conducted it to the exclusion of Mr. Larkin. We further draw the reasonable inference that the real estate business activities were generally conducted during normal business hours and further infer that Mr. Larkin generally

---

[40]The two exceptions were (1) a Schedule E attached to petitioners' 2003 return that reported $1,410 of rent received from a rental real estate property that was offset by $8,610 in expenses, generating a loss that respondent disallowed; and (2) a Schedule E attached to petitioners' 2006 return that reported partnership income of $1,937from the "Larkin Family Partnership" and estates and trust income of $20,000" from "Barb + James Larkin".

**[*54]** was present at the SSD London office at these times. Thus, we conclude,

Mr. Larkin conducted a greater-than-insubstantial portion of the real estate

business activities from the SSD London office. Given the reasonable inferences

concerning Mr. Larkin's conduct of the real estate business activities and the site of

the business's bookkeeping, we conclude that petitioners have failed to

demonstrate that the bedroom/office in their residence was the principal place of

business of the real estate business. Petitioners have not shown, or even suggested,

that the bedroom/office was used for meeting clients. Accordingly, petitioners are

not entitled to deduct any amounts arising from the claimed business use of their

residence during the subject years.[41]

C.      Depreciation

Petitioners reported a depreciation expense on their Schedule C for each

subject year. Mr. Larkin testified that these items represented depreciation of

computer equipment located in the bedroom/office at petitioners' residence.

Petitioners have substantiated the purchase of a computer and related equipment,

with an invoice from 2002, and the fact that a computer was still in their

_____

[41]Mr. Larkin testified that an unspecified portion of the insurance expense related to an automobile that petitioners used in the real estate business to meet with one of the business' partners and to meet with developers. He produced no substantiation regarding the insurance expenses, however, and we accordingly are not persuaded that petitioners are entitled to deduct any portion of the insurance expense that may have related to an automobile.

[*55] possession through at least 2004, with an invoice for computer repairs dated October 20, 2004.

A depreciation deduction is available only with respect to property used in a trade or business (or held for the production of income). Sec. 167(a). As noted, computers are "listed property", and therefore no deductions are allowed with respect to them unless their business use is substantiated in a manner that demonstrates the proportion of business use to total use. See sec. 1.274-5T(b)(6)(i)(B), Temporary Income Tax Regs., supra.

According to Mr. Larkin's testimony, the computer in question was in the bedroom/office in petitioners' residence and regularly used by Mrs. Larkin. In the circumstances, we simply do not find credible any assertion or implication that the computer was used 100% for business--at least not without some additional proof such as the existence of a second computer in the residence devoted to personal use. Even if we credited Mr. Larkin's self-serving testimony to the effect that Mrs. Larkin regularly assisted in the real estate business activities, that fact would fall well short of establishing the amount of business use of the computer during the subject years. Petitioners have not demonstrated, or even suggested, the proportions of business versus personal use of the computer, as required by section 1.274-5T(b)(6)(i)(B), Temporary Income Tax Regs., supra, to sustain any

[*56] deduction for business use of the computer. Accordingly, we sustain respondent's disallowance of the deductions for depreciation expenses that petitioners claimed on the Schedules C for the subject years.

D.    Interest

Petitioners reported nonmortgage interest expenses of $25,700, $27,610, $31,370, and $23,710 on their Schedules C for 2003, 2004, 2005, and 2006, respectively. Mr. Larkin testified that the interest expenses related mainly to personal lines of credit used in the real estate business. He also testified that he obtained against his residence a £50,000 general line of credit for real estate investments.

The only possible substantiation for the interest expenses reported on the Schedules C are two letters addressed to petitioners from a representative of the International Private Banking division of Riggs & Co. Both letters refer to certain interest that would be due from petitioners on future dates in 2003 and 2004, but the letters do not establish that the interest was in fact paid. We accordingly sustain respondent's determination disallowing any deductions for the interest petitioners reported on the Schedules C.

[*57] E.     Pension and Profit Sharing

Petitioners reported a $28,000 pension plan expense on the Schedule C for each subject year.  Respondent determined and argues that petitioners failed to establish that Mr. Larkin made any contributions to a pension plan during the subject years.[42]  We disagree.  For 2003 and 2006 at least, the supporting schedules to the Schedules K-1 that SSD issued to Mr. Larkin list contributions made on his behalf to a pension or Keogh plan of $28,000 and $29,000, respectively.  We are satisfied from the surrounding circumstances that the supporting schedules are reliable and that they demonstrate that Keogh plan contributions in those amounts were made on Mr. Larkin's behalf from his partnership distributions.  There are no such supporting schedules in the record for 2004 and 2005.  We accordingly hold that petitioners are entitled to deduct pension plan contributions of $28,000 and $29,000 for 2003 and 2006, respectively, and we sustain respondent's disallowance of the deductions for pension plan contributions for 2004 and 2005.

---

[42]Respondent has not disputed Mr. Larkin's eligibility as a self-employed individual to deduct contributions to a Keogh plan for the subject years.  See generally sec. 404(a)(8).  Respondent contends only that petitioners have failed to substantiate that any contributions were made on Mr. Larkin's behalf from his earned income.

**[\*58]** F.    <u>Travel, Meals, and Entertainment</u>

Petitioners reported travel expenses of $4,800, $4,670, $6,380, and $6,820 on their Schedules C for 2003, 2004, 2005, and 2006, respectively. They reported meals and entertainment expenses (after reducing the amounts by the 50% limitation imposed by section 274(n)) of $2,150, $1,905, $3,210, and $3,750 for those same years, respectively. The notices of deficiency determined that deductions for all such expenses should be disallowed for, inter alia, lack of substantiation. Petitioners proffered no substantiation at trial, Mr. Larkin testifying that he had documentation of the expenses at home in the U.K. This testimony does not meet the substantiation requirements of section 274(d). We therefore sustain respondent's determination disallowing any deductions for these expenses.

G.    <u>Medical Insurance Premiums</u>

Petitioners reported "medical" expenses on the Schedules C of $10,396, $13,941, $14,270, and $15,330 for 2003, 2004, 2005, and 2006, respectively, all of which respondent disallowed for lack of substantiation. Mr. Larkin's testimony clarified that the expenses so listed represented medical insurance premiums for himself and his family relating to a policy in the name of SSD that SSD paid on his behalf.

[*59] A self-employed individual generally is allowed a deduction for amounts paid during the taxable year for medical insurance. See sec. 162(l). This treatment extends to a partner on whose behalf a partnership has paid for medical insurance. See Rev. Rul. 91-26, 1991-1 C.B. 184.[43]

Mr. Larkin testified that the "medical" expenses reported on the Schedules C are substantiated through the Schedules K-1 and accompanying statements that SSD issued to him.

Attached to petitioners' 2003 return is a schedule issued to him by SSD reporting that $8,396 was withheld from his partnership distributions for medical insurance premiums. Petitioners' 2006 return contains a similar schedule but it reports that $0 in medical insurance premiums was withheld. Petitioners' 2004 and 2005 returns do not contain any SSD-issued or other document referencing medical insurance premiums.

The SSD statements (or lack thereof as to 2004 and 2005) when viewed in the light of all of the credible evidence in the record persuade us that SSD withheld and paid $8,396 in medical insurance premiums on Mr. Larkin's behalf for 2003.[44]

---

[43]Respondent has not argued that Mr. Larkin failed to satisfy any requirement of sec. 162(l) or Rev. Rul. 91-26, 1991-1 C.B. 184; he contends that petitioners have failed to substantiate the deductions claimed.

[44]Petitioners have offered no explanation for the $2,000 difference between
(continued...)

[*60] The SSD statement for 2006 persuades us that no such premiums were paid, and there is no substantiation for any payment of medical insurance premiums for 2004 and 2005.  We accordingly hold that petitioners are entitled to deduct $8,396 in medical insurance premiums for 2003 in computing their adjusted gross income; and we sustain respondent's disallowance of deductions for the remaining amount reported as a "medical" expense on petitioners' 2003 Schedule C and all amounts so listed on petitioners' 2004-2006 Schedules C.

H.    Home Leave

Petitioners reported expenses for "Home Leave" on the Schedules C of $7,450, $8,680, $9570, and $10,090 for 2003, 2004, 2005, and 2006, respectively, deductions for all of which respondent disallowed.  Mr. Larkin testified that petitioners and their three daughters traveled to the United States annually during the subject years to visit relatives and friends and that SSD did not reimburse him for the costs associated therewith.  The amounts reported as home leave expenses reflect the costs of the annual visits.

Petitioners cite no Code section or other authority that would allow them to deduct these apparently personal expenses, and we are not persuaded that they may

---

[44](...continued)
the $8,396 reported on the SSD-issued statement and the $10,396 reported as a "medical" expense on their 2003 Schedule C.

[*61] deduct any part of them. See sec. 262 (generally disallowing a deduction for personal, living, or family expenses). We sustain respondent's disallowance of the deductions for these expenses for all subject years.

VIII. Rental Expenses

Respondent disallowed a deduction for $8,610 of rental expenses that petitioners claimed on a Schedule E for 2003 on the grounds that petitioners failed to establish that the expenses were incurred and paid or were attributable to property held for the production of income. Mr. Larkin testified that the $8,610 was his distributive share of the expenses reported on the Schedule K-1 that SSD issued to him for 2003. Petitioners argue that they may deduct those expenses because "[p]roper substantiation of this expense was provided with the K-1 filed by * * * [SSD]."

We do not find attached to petitioners' 2003 return any Schedule K-1 or other information return that lists the referenced expenses. Nor are we persuaded that these expenses are related to SSD. Given the absence of any substantiation that these expenses were incurred or paid, we sustain respondent's determination disallowing the deduction.

**[*62]** IX.     Itemized Deductions

    A.     Overview

Respondent disallowed all of petitioners' itemized deductions claimed on Schedule A for each subject year on the grounds that petitioners failed to substantiate that the expenses were incurred and paid or that they qualified as deductible expenses. Petitioners argue that these amounts are "routine and have been fully substantiated" and contend that they are entitled to deduct them. We analyze each itemized deduction seriatim bearing in mind that in order to prevail petitioners must substantiate the expenses underlying these deductions notwithstanding whether the expenses are of the type that comparable taxpayers commonly incur.

    B.     Real Estate Taxes and Home Mortgage Interest

Petitioners claimed itemized deductions on Schedules A for home mortgage interest and real estate taxes for each subject year. They rely upon the Schedules K-1 that Treetops issued to them to substantiate a portion of the deductions. Mr. Larkin testified that the remaining amounts of home mortgage interest and real estate taxes relate to interest and taxes paid with respect to petitioners' U.K. residence.

**[\*63]** In general, for cash basis taxpayers who elect to itemize deductions, interest paid during the taxable year with respect to indebtedness incurred in acquiring a principal and a second residence is deductible. See secs. 63(d) and (e), 163(h)(2)-(4); sec. 1.121-1, Income Tax Regs. Likewise, such taxpayers may deduct State and local, and foreign, real property taxes paid within the taxable year. Sec. 164(a)(1).

Treetops was a "small partnership" within the meaning of section 6231(a)(1)(B), as the record establishes that it had, at most, two partners (petitioners and another married couple)--married couples being treated for this purpose as a single partner, see sec. 6231(a)(1)(B)(i)--and there is no evidence that Treetops made an election at any time not to be treated as a "small partnership", see sec. 6231(a)(1)(B)(ii). Consequently, the unified audit and litigation procedures of the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub. L. No. 97-248, sec. 402, 96 Stat. at 648, do not apply to Treetops. See Howell v. Commissioner, T.C. Memo. 2012-303, at \*6 n.3; McKnight v. Commissioner, T.C. Memo. 1991-514, supplemented by 99 T.C. 180 (1992), aff'd, 7 F.3d 447 (5th Cir. 1993). As a result, the partnership items reported on the Schedules K-1 Treetops issued to petitioners are subject to redetermination in this proceeding, rather than in a partnership-level proceeding governed by the TEFRA provisions,

**[*64]** and petitioners must substantiate expenses reported on the Schedules K-1. They have not done so, and accordingly they are not entitled to deduct the interest and real estate taxes reported on the Schedules K-1 that Treetops issued to them.

The only possible substantiation for the remaining home mortgage interest is the two letters addressed to petitioners from a representative of the International Private Banking division of Riggs & Co. previously discussed. However, as previously noted, these letters do not establish that any interest was actually paid. There is no other documentary evidence in the record that would substantiate the amounts or timing of any home mortgage interest payments during the subject years. We accordingly sustain respondent's determination disallowing the home mortgage interest deductions petitioners claimed for the subject years.

Petitioners offer as substantiation for the remaining real estate taxes two tax bills from the Elmbridge Borough Council in Esher, Surrey. Each bill indicates that the property being taxed is petitioner's U.K residence. The first bill, dated December 4, 2003, states that the amount due for the fiscal year ended March 31, 2004, is £1,938 and acknowledges payments to the bill's date of £1,550, with a balance due of £388. This bill persuades us that petitioners have substantiated the payment of £1,550 in real property taxes for 2003. The second bill, dated June 4, 2004, states that the amount due for the fiscal year ended March 31, 2005, is

[*65] £2,041 and acknowledges payments to the bill's date of £410. This bill persuades us that petitioners have substantiated the payment of £410 in real property taxes for 2004. We hold that petitioners are entitled to deduct these amounts for the years noted.[45]

C.    Gifts

Petitioners claimed charitable contribution deductions for cash contributions on Schedules A of $2,200, $2,930, $2,790, and $3,720 for 2003, 2004, 2005, and 2006, respectively, all of which respondent disallowed for lack of substantiation.

Section 170(a) allows a deduction for charitable contributions paid within the taxable year "only if verified under regulations prescribed by the Secretary". Section 1.170A-13(a), Income Tax Regs., provides that a taxpayer who makes a charitable contribution of money shall maintain with respect to the contribution either a canceled check, a receipt from the donee charitable organization, or "other reliable written records showing the name of the donee, the date of the contribution, and the amount of the contribution."

Mr. Larkin testified that the gifts were contributions that he made mainly to church and to charities and that these gifts were "customary and appropriate". He

---

[45]We expect the parties as part of their Rule 155 computations to agree to a conversion rate to U.S. dollars of these amounts and to take into account whether any itemized deductions to which we have held petitioners are entitled would exceed the standard deduction respondent determined to allow for each year.

[*66] conceded that he did not have any substantiation to offer at trial for any of the claimed gifts. In the absence of any substantiation from petitioners, we sustain respondent's determination in full.

### D.    Casualty Losses

Petitioners claimed casualty or theft loss deductions on Schedules A of $4,800 and $1,430 for 2003 and 2004, respectively, both of which respondent disallowed for lack of substantiation.

An individual taxpayer may generally deduct losses on property not connected with a trade or business to the extent that the losses arise from a casualty such as a fire or storm. See sec. 165(a), (c)(3). The amount of the deduction is the lesser of either the difference between the fair market value of the property immediately before and after the casualty or the adjusted basis of the property, diminished by $100 for each incident of loss and by the amount compensated for by insurance or otherwise. See sec. 165; sec. 1.165-7(b)(1), Income Tax Regs. Accordingly, to substantiate a casualty loss deduction, petitioners must prove, among other things, the adjusted basis and the fair market value of the property immediately before and after each casualty. See Millsap v. Commissioner, 46 T.C. 751, 759-760 (1966), aff'd, 387 F.2d 420 (8th Cir. 1968).

**[*67]** Petitioners did not provide any credible evidence to substantiate their bases in the relevant property, or the fair market value of any of the property immediately before or after the claimed casualty. We accordingly sustain respondent's determination in full.

E.    Other Expenses

Petitioners claimed "other expenses" deductions on Schedules A of $1,400, $1,460, $2,408, and $2,060 for 2003, 2004, 2005, and 2006, respectively, all of which respondent disallowed for lack of substantiation.[46]

Mr. Larkin conceded that he did not have at trial any substantiation for the "other expenses" but that they were "customary and appropriate". In the absence of any substantiation from petitioners, we sustain respondent's determination in full.[47]

X.    Self-Employment Tax

Petitioners did not report any self-employment tax liability for any of the subject years. Respondent determined that petitioners were liable for self-

---

[46]The amounts petitioners deducted for 2004-2006 were net of the "2% of AGI" floor on miscellaneous itemized deductions imposed by sec. 67. The amount they deducted for 2003 was computed without that limitation.

[47]Petitioners do not seek to deduct State and municipal nonresident taxes SSD reported on the one-page schedules related to the 2003 and 2006 Schedules K-1, and we do not consider that issue.

[*68] employment taxes of $21,173, $22,037, $22,879, and $23,474 for 2003, 2004, 2005, and 2006, respectively.

Individual taxpayers are liable for self-employment tax on their self-employment income. See sec. 1401(a). Self-employment income generally includes an individual's net earnings from self-employment in a trade or business, a partner's distributive share of income or loss from any trade or business carried on by a partnership of which he is an owner, and guaranteed payments from the partnership. See sec. 1402; sec. 1.1402(a)-1, Income Tax Regs.; see also Tietig v Commissioner, T.C. Memo. 2001-190, 82 T.C.M. (CCH) 304, 316 (2001), aff'd, 57 F. App'x 414 (11th Cir. 2003). Petitioners bear the burden of proving that they are not liable for the self-employment tax that respondent determined. See Rule 142(a); Tietig v. Commissioner, 82 T.C.M. (CCH) at 316.

There is no dispute that Mr. Larkin had self-employment income equal to his guaranteed payments and distributive share of ordinary income from SSD for the subject years. Instead, petitioners argue that their self-employment income is not subject to self-employment tax because "they have been paying into the UK social insurance schemes and have met the tests under the UK/US Tax Treaty for credit against US obligations." Respondent argues that petitioners have not established that they were required to pay into a U.K. social insurance system that would serve

**[*69]** to eliminate their liability for U.S. self-employment tax, or that petitioners actually paid into the U.K. system. We agree with respondent.

Petitioners support their position primarily with a June 3, 2010, letter that the National Insurance Contributions Office (of HM Revenue & Customs) in the U.K. sent to Mr. Larkin. The letter states that it "contains details of your NICs [National insurance contributions] from 6 April 1999 to 5 April 2009."[48] As to those years, the letter states, Mr. Larkin made the following contributions (in U.K. pounds):

| For tax year | As an employed person (Class 1) | Self-employed (Class 2) | Voluntary | Credits |
|---|---|---|---|---|
| 1999/2000 | £2,257.20 | -0- | -0- | -0- |
| 2000/2001 | 2,388.00 | -0- | -0- | -0- |
| 2001/2002 | 634.20 | -0- | -0- | -0- |
| 2002/2003 | -0- | -0- | -0- | -0 |
| 2003/2004 | -0- | -0- | -0- | -0- |
| 2004/2005 | -0- | -0- | -0- | -0- |
| 2005/2006 | -0- | -0- | -0- | -0- |
| 2006/2007 | -0- | -0- | -0- | -0- |
| 2007/2008 | -0- | -0- | -0- | -0- |
| 2008/2009 | -0- | -0- | -0- | -0- |

[48]It is apparent from the letter that a fiscal year ending April 5 is used for purposes of the U.K. social insurance system.

**[*70]** Mr. Larkin testified that, in addition to the amounts shown in this letter, petitioners paid into the U.K. social insurance system through a variety of means, such as through partnership payments, through individual payments, and through their payment of taxes.

Petitioners claim that they have proven that they were required to (and did) make payments in the U.K. that were the equivalent of paying U.S. self-employment taxes. We disagree. While it is true that petitioners contributed to the U.K. social insurance system during 1999 through 2002, petitioners have failed to persuade us that they made any payments to that system during the subject years. In addition, petitioners have cited no provision, nor are we aware of any such provision, that would exempt Mr. Larkin from liability for self-employment taxes for the subject years simply because for the three prior years he contributed £5,279.40 into the U.K. social insurance system.

We accordingly sustain respondent's determination that Mr. Larkin is liable for self-employment taxes for the subjects years as described above.

XI. Foreign Tax Credits

Petitioners claimed foreign tax credits of $7,381, $6,787, $6,572, and $49,459 for 2003, 2004, 2005, and 2006, respectively. The credits offset the tax reported as due for each year. Respondent disallowed them all, on the grounds

[*71] petitioners had failed to document adequately the payment of taxes to a foreign government.

Section 901(a) generally allows a taxpayer a foreign tax credit for foreign income taxes paid.[49] Subject to the rules of section 904(a), which generally limit the credit to the amount of U.S. tax on foreign income, the credit generally equals the amount of income tax paid during the taxable year to a foreign country or a U.S. possession. See sec. 901(b)(1). Generally, any unused foreign tax credit may be carried back and credited against U.S. income tax liability for the preceding taxable year (or in the case of excess foreign taxes arising in taxable years beginning before October 23, 2004, the preceding two years) and then, to the extent still unused, may be carried forward and credited against U.S. income tax for the following 10 taxable years. See sec. 904(c).

Respondent concedes that petitioners have demonstrated that they paid income taxes to the U.K. aggregating £218,914 during FYE March 31, 2000, 2001, and 2002. There is no evidence in the record that petitioners paid any additional U.K. income taxes after March 31, 2002. Petitioners maintain that they are entitled

---

[49]A cash-basis taxpayer generally must take the foreign tax credit for the year in which the foreign taxes were paid, unless the taxpayer elects to take the credit in the year in which the foreign taxes accrue. See sec. 905(a). We understand petitioners' position to be that they did not make such an election, and we proceed accordingly.

**[\*72]** to carry forward foreign tax credits in the amounts claimed for the subject years.[50]  Respondent disagrees, contending that petitioners have failed to demonstrate what portion of the foregoing U.K. taxes paid were creditable against their U.S. income tax liability for the taxable years before the subject years; namely, 2000, 2001, and 2002.  Consequently, respondent contends, petitioners have not shown whether or to what extent they had foreign tax credit carryovers for the subject years.

We agree with respondent.  A taxpayer claiming a carryover of a credit must establish both the existence of the credit and the amount of any credit that may be carried over to a subsequent year.  See Rule 142(a)(1); Segel v. Commissioner, 89 T.C. 816, 842 (1987); cf. Keith v. Commissioner, 115 T.C. 605, 621 (2000).  Petitioners' 2000 through 2002 Federal income tax returns are not in the record.

---

[50]In an effort to substantiate their claimed foreign tax credit carryovers, petitioners offered into evidence Forms 1116 purporting to cover the years 2000 through 2004 that Mr. Larkin had prepared at the request of respondent's Office of Appeals when the subject year returns were under review.  The Forms 1116 list the foreign taxes that petitioners claim they paid during the years covered by the Forms as well as foreign taxes purportedly paid in years before 2000 and available to be carried forward to that year for crediting.  The figures on these Forms 1116 differ markedly from the figures used on the returns as originally filed, casting doubt on both.  In any event, a tax return does not establish the truth of, or substantiate, the matters set forth therein; it is merely a statement of the taxpayer's claim.  See Wilkinson v. Commissioner, 71 T.C. 633, 639 (1979); Roberts v. Commissioner, 62 T.C. 834, 837 (1974); Halle v. Commissioner, 7 T.C. 245, 250 (1946), aff'd, 175 F.2d 500 (2d Cir. 1949).  Consequently, the only foreign tax payments that have been substantiated are those discussed above.

[*73] The record does establish, however, that Mr. Larkin earned compensation for the fiscal years ended March 31, 2000, 2001, and 2002, of £256,701, £264,715, and £64,317, respectively, creating a reasonable inference that he incurred U.S. Federal income tax liabilities for 2000, 2001, and 2002.[51] Those Federal income tax liabilities for the years immediately preceding the subject years would have absorbed some or all of the foreign tax credits arising from the payment of the U.K income taxes that petitioners have demonstrated. Consequently, petitioners have failed to prove the amount of any foreign tax credit carryovers available for the subject years and we accordingly sustain respondent's disallowance of the foreign tax credits claimed.

XII.   Section 6662 Accuracy-Related Penalties

Respondent determined for each subject year that petitioners are liable for an accuracy-related penalty under section 6662(a) on the basis of negligence and a substantial understatement of income tax. The primary basis that respondent advances on brief is the latter. We limit our discussion to that ground.

---

[51]Mr. Larkin commenced work as a partner at SSD sometime during the fiscal year ended March 31, 2002. His compensation from SSD for the period is not in the record, but in view of the fact that his annual compensation for the subject years exceeded $400,000 in each year, a reasonable inference exists that his compensation for SSD during the fiscal year ended March 31, 2002, was not insignificant.

**[*74]** Section 6662(a) and (b)(2) imposes a 20% accuracy-related penalty for any portion of an underpayment that is attributable to a substantial understatement of income tax. An understatement is the excess of the amount of tax required to be shown on the return over the amount of tax imposed that is shown on the return, reduced by any rebate. See sec. 6662(d)(2)(A). An understatement is substantial if it exceeds the greater of 10% of the tax required to be shown on the return or, in the case of an individual, $5,000. See sec. 6662(d)(1)(A).

The Commissioner bears a burden of production with respect to the applicability of an accuracy-related penalty. See sec. 7491(c). That burden requires that the Commissioner produce sufficient evidence that it is appropriate to impose an accuracy-related penalty. See Higbee v. Commissioner, 116 T.C. at 446. Once the Commissioner has met this burden, the burden of proof is upon the taxpayer to prove that the accuracy-related penalty does not apply because (as applicable here) the taxpayer acted with reasonable cause and in good faith as to the underpayment. See sec. 6664(c)(1); Higbee v. Commissioner, 116 T.C. at 446-447.

The deficiency amounts that we have sustained herein establish that petitioners have an understatement of income tax for each subject year that exceeds the greater of $5,000 or 10% of the amount required to be shown on the return.

[*75] We conclude that respondent has met his burden of production. Petitioners will avoid the accuracy-related penalties only to the extent that they prove that they acted with reasonable cause and in good faith as to the underpayments (or any portion thereof). Whether they satisfy this standard is a factual determination; their effort to assess their proper tax liability is generally the most important factor. See sec. 1.6664-4(b)(1), Income Tax Regs.

Petitioners argue that they have established reasonable cause because their returns report all of Mr. Larkin's income from SSD and, as to the 2003 through 2005 returns, report their income, credits, deductions, and exclusions in the way that the revenue officer told them to.[52] Mr. Larkin testified that petitioners' returns were complicated because, in part, in 2003 and 2004 he worked both as a partner for SSD and in his real estate business, that he was confused on how to report both activities, that petitioners could find no qualified person to help them prepare the returns, and that he sought the guidance of the IRS as to the preparation of the

---

[52]Petitioners subpoenaed the revenue officer to appear at trial. At the commencement of the trial, respondent's counsel informed the Court that the revenue officer was in Florida on an exigent family matter. Mr. Larkin, an experienced attorney, did not seek to enforce the subpoena or ask the Court to leave the record open for the purpose of eliciting the revenue officer's testimony at a later time. Mr. Larkin also did not identify any issues upon which petitioners desired to elicit testimony from the revenue officer. Although petitioners in their answering brief now request that respondent make the revenue officer available for questioning, the evidentiary record in these cases is closed.

[*76] returns. He further testified that he met with the revenue officer, that the revenue officer specifically directed him how to report the items related to SSD, to the real estate business, and to petitioners' income exclusion, and that he and the revenue officer agreed that petitioners should file petitioners' 2003 and 2004 returns on the agreed-upon basis. Mr. Larkin further testified that he discussed the matter with some of his colleagues who were tax professionals and that they confirmed the revenue officer's direction.

We find Mr. Larkin's memory on this subject to be far from clear, and we decline to rely upon that testimony. His communications with the revenue officer were limited, and we are not persuaded that the revenue officer directed Mr. Larkin (let alone that Mr. Larkin and the revenue officer agreed) on the proper way to report items on petitioners' tax returns. The revenue officer contacted petitioners to collect their unpaid taxes for prior years; and while the revenue officer's ensuing discussions and correspondence with Mr. Larkin addressed the goal that petitioners file certain returns, the record does not lead us to conclude that the revenue officer directed Mr. Larkin on how the referenced items should be reported on petitioners' 2003-2005 tax returns. We do not find, for example, any notes, recordings, or other tangible evidence to support Mr. Larkin's testimony on this matter although

**[\*77]** we do find that Mr. Larkin was mindful to prepare handwritten notes of at least one of his conversations with the revenue officer.[53]

Nor do we accept Mr. Larkin's testimony that he tried to locate a qualified professional who was knowledgeable on both the U.S. and the U.K. tax regimes to advise him on the matter but that he was unable to find such an individual. Mr. Larkin admitted that he regularly consulted accountants and tax professionals concerning his U.S. and U.K. income tax returns and that he consulted professionals to confirm what the revenue officer told him. He also admitted that (1) SSD has instructional programs on Federal and U.K. taxation, but that he attended none of these programs, (2) he knew of accountants or similar professionals whom he could have consulted but declined to do so because, he stated, such advice was expensive and advice that he had received from one professional tax adviser regularly tended to be inconsistent with the advice he received from another professional, and (3) SSD has documentation that its overseas attorneys could obtain to help them fill out their tax returns. We also note that petitioners' status as U.S. citizens residing abroad arose in 1999 and that they had been required to take that status into account when filing their Federal income tax returns for all years thereafter.

---

[53]While Mr. Larkin testified that he had such notes back at his home in the U.K., his obligation at trial was to proffer whatever documentary evidence he had.

**[\*78]** Perhaps most importantly, the understatement of income tax for each year is due to petitioners' failure to navigate successfully any complex tax provisions arising from the U.K. situs of Mr. Larkin's gainful employment.  For example, to the extent petitioners reported Mr. Larkin's guaranteed payments and other partnership distributions on their Schedules C (rather than Schedules E), net of their claimed foreign earned income exclusion, that idiosyncratic reporting did not give rise to any understatements of income tax.  They have been accorded the maximum foreign earned income exclusion for each year, and they were denied any deductions for foreign housing costs because they failed to substantiate them in amounts above applicable floors--even though they reported substantially larger housing expenses on their returns.  The remainder of each understatement of income tax is due, primarily, to an utter failure to substantiate items reported on their returns running into the thousands of dollars and to a lesser extent to failures to report income of which petitioners were fully aware.  In sum, the absence of reasonable cause here is patent; we are not persuaded that petitioners made a good-faith effort to determine their tax liability for any of the subject years.  We sustain respondent's determinations of the accuracy-related penalties.

[*79] XIII.  Section 6651(a)(1) Additions to Tax

Respondent determined that petitioners are liable for additions to tax pursuant to section 6651(a)(1) for 2003 and 2005 for failure to file timely.  That section imposes an addition to tax for failure to file a return by its due date unless the taxpayer demonstrates that the failure to file was due to reasonable cause and not due to willful neglect.  The addition to tax equals 5% (of the tax that is due and not paid) for each month (or fraction thereof) that the return is late, but may not exceed 25% in total.  See sec. 6651(a)(1), (b)(1).  Thus, the maximum addition to tax is reached when a return is more than 4 months late.  Reasonable cause may exist if a taxpayer exercised ordinary business care and prudence and was nonetheless unable to file a return within the time prescribed by law.  See sec. 301.6651-1(c)(1), Proced. & Admin. Regs.  Willful neglect connotes "a conscious, intentional failure or reckless indifference" with respect to timely filing.  United States v. Boyle, 469 U.S. 241, 245 (1985).

The Commissioner bears the burden of production with respect to the addition to tax under section 6651(a)(1).  See sec. 7491(c); Higbee v. Commissioner, 116 T.C. at 446-447.  To meet this burden, he must produce sufficient evidence that it is appropriate to impose the addition to tax.  Once the Commissioner has met his burden, the burden of proof as to reasonable cause or

[*80] other mitigating factors shifts to the taxpayer. See Higbee v. Commissioner, 116 T.C. at 447.

Petitioners' 2003 return was due April 15, 2004,[54] and was filed May 22, 2005.[55] Petitioners' 2005 return was due on June 15, 2006,[56] and was filed on July 16, 2006.[57] Accordingly, respondent has met his burden of production with respect to the additions to tax. See id.

---

[54]Although sec. 1.6081-5(a)(5), Income Tax Regs., grants an additional two months beyond April 15 for filing in the case of U.S. citizens or residents whose tax homes are outside the United States, sec. 1.6081-5(b), Income Tax Regs., as in effect for 2003 returns, requires that a statement be attached to the return to the effect that the taxpayer satisfies the tax home requirement. There is no evidence that any such statement was attached to petitioners' 2003 return. In any event, it makes no difference whether petitioners' 2003 return was due on April 15 or June 15, 2004, as the maximum 25% penalty for a delay exceeding four months would apply (absent reasonable cause), given that the return was not filed until May 22, 2005.

[55]That is the date of petitioners' signatures on the return, and respondent agrees that date is the date of filing.

[56]The certified copy of the Form 4340, Certificate of Assessments, Payments, and Other Certified Matters, in the record for petitioners' 2005 taxable year (2005 Form 4340) records the grant of an extension to June 15, 2006 (consistent with sec. 1.6081-5(a)(5), Income Tax Regs.).

[57]Although the 2005 Form 4340 records that petitioners' 2005 return was filed on July 26, 2006, respondent concedes on brief that the return was filed on July 16, 2006, the date of petitioners' signatures on the return. Again, it makes no difference whether the return was filed on July 16 or July 26, 2006, as either date is one month and a fraction of a second month beyond the due date, resulting in an addition equal to 10% of the tax due and not paid (absent reasonable cause).

[*81] Petitioners argue that they are not liable for the addition to tax for 2003 because they timely filed their 2003 return within an extended period agreed to (both orally and in writing) by an IRS employee, "given the issues of first impression being resolved and the recent death of Petitioner husband's parents (after an extended illness in the case of one)." Petitioners add that the IRS employee assured them that they could file their 2003 return by the extended date without adverse consequences. Mr. Larkin further testified that his parents died one month apart from each other in the first five months of 2004 and that his life was chaotic around the time that the 2003 return was due. Mr. Larkin further testified that he believed that petitioners had sufficient foreign tax credit carryovers to 2003 to offset any tax otherwise due for that year and that petitioners therefore believed that they had extra time to file the return given the absence of any tax liability for that year. Petitioners argue that they are not liable for the addition to tax for 2005 because they timely filed the 2005 return within an automatic four-month extended period applicable to overseas residents.

We disagree with petitioners' claim that they had reasonable cause for filing their 2003 and 2005 returns untimely. First, as to their claim that they were granted an extension for filing the 2003 return, we find nothing in the record to support that claim. Mr. Larkin's notes on his meeting with the revenue officer on

**[*82]** April 13, 2005, indicated that they discussed the filing of an extension for 2004 (for which year a tax return was soon due), but those notes made no mention of the revenue officer's allowing petitioners to file their already late 2003 return without penalty. In addition, while they claim that they received such an extension in writing, we find no such writing in the record. Likewise, while they claim that an IRS employee also orally granted them such an extension, we find no credible evidence of that either.[58] In fact, petitioners' position that the revenue officer gave them a valid extension as to their 2003 return seems illogical considering that the 2003 tax return was long overdue when the revenue officer first contacted petitioners. As to the 2005 return, we add that petitioners have cited nothing in the Code or in an administrative rule prescribed thereunder that would give them in their capacity as U.S. citizens living abroad an automatic four-month extension.

Nor do we conclude that petitioners met the reasonable cause exception by virtue of their claim that Mr. Larkin believed that petitioners had sufficient tax credits for 2003 to negate any tax for that year, or due to the death of Mr. Larkin's parents. As to the former, the Code provides no exception to imposing an addition to tax under section 6651(a) on the grounds of a perceived overpayment of tax for

---

[58]Moreover, even if these statements were made, those oral statements are not binding on the Commissioner. See Schwalbach v. Commissioner, 111 T.C. 215, 228 n.4 (1998).

[*83] the year. As to the latter, while undoubtedly Mr. Larkin experienced some diminished capacity as a result of both his parents dying in close succession, the test in these circumstances is whether the taxpayer had capacity to attend to other responsibilities besides return filing. See Wright v. Commissioner, T.C. Memo. 1998-224, slip. op. at *5 (and cases thereat cited), aff'd, 173 F.3d 848 (2d Cir. 1999). In view of the fact that Mr. Larkin at least[59] was functioning as a partner at a major law firm and earning in excess of $400,000 annually during the relevant period, we conclude that petitioners did not have reasonable cause for their failure to timely file returns. We therefore sustain respondent's determination that petitioners are liable for additions to tax under section 6651(a)(1) for 2003 and 2005.

XIV. Epilogue

We have considered all arguments that the parties made for holdings contrary to those that we reach herein and, to the extent not discussed, we have rejected those arguments as without merit. In order to reflect the foregoing,

Decisions will be entered under

Rule 155.

---

[59]There is no evidence concerning Mrs. Larkin's capacity during the relevant periods.